Filed 4/6/18

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C077542 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF131842) |
| v. | |
| ROOSEVELT BEATTY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Stephen L. Mock, Judge. Affirmed as modified.

Ron Boyer, Retained Counsel for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., and V. of the Discussion.

1

In this appeal from drug trafficking convictions, we address the question of whether the case against a drug supplier was tried in a proper venue. On two occasions, Detective Ryan Bellamy placed calls from Yolo County to Marc Costa in neighboring Sacramento County, from whom Bellamy, in his capacity as an undercover police officer, was seeking to purchase methamphetamine. On both occasions, Bellamy met Costa at a location in Sacramento County. Thereafter, Costa called defendant, who supplied Costa with methamphetamine while in Sacramento County. Then, while still in Sacramento County, Costa sold Bellamy the methamphetamine he had just obtained from defendant. Defendant was prosecuted in Yolo County.

A jury found defendant guilty of two counts of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 1 & 4), two counts of sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 2 & 5), and two counts of possession of methamphetamine for sale (Health & Saf. Code, § 11378; counts 3 & 6). At a bifurcated proceeding, the trial court found that the prosecution proved various recidivist enhancements beyond a reasonable doubt. Defendant was sentenced to an aggregate determinate term of 16 years imprisonment.

On appeal, defendant asserts that the judgment must be reversed because the Yolo County Superior Court did not have jurisdiction over the charged offenses. In the published portion of this opinion, we conclude that Yolo County was a proper venue to try defendant. Unlike determinations of the sufficiency of the evidence to support a guilty verdict where the standard of appellate review is substantial evidence, " 'a trial court's determination of territorial jurisdiction will be upheld as long as there is "*some evidence*" to support its holding.' " (*People v. Thomas* (2012) 53 Cal.4th 1276, 1283 (*Thomas*), italics added; *People v. Chavarria* (2013) 213 Cal.App.4th 1364, 1369 (*Chavarria*).) The record discloses some evidence that defendant aided and abetted a drug dealer by supplying drugs to the dealer for the purpose of selling the drugs to a third party who had contacted the dealer from Yolo County. The calls from Yolo County

2

initiating the transactions provided the requisite preparatory acts or preparatory effects to establish venue.

In the unpublished portion of this opinion, we address defendant's other contentions. Defendant asserts that the evidence was legally insufficient to support the trial court's determination that his strike allegation had been proven beyond a reasonable doubt. As to sentencing, defendant contends that the trial court should have stayed execution of the sentences imposed on the convictions of possession of methamphetamine for sale pursuant to Penal Code section 654[1] instead of running them concurrently. Defendant further asserts that the abstract of judgment must be modified to delete a Health and Safety Code section 11372.7 drug program fine never orally imposed by the trial court. In supplemental briefing, defendant asserts that, because of a recent change in the law, two prior drug trafficking conviction enhancements imposed pursuant to former Health and Safety Code section 11370.2 must be struck and the sentences imposed thereon vacated.

We agree with defendant, and the Attorney General concedes, that there was insufficient evidence to sustain the strike allegation. We also agree that the trial court should have stayed execution of the sentences imposed on the convictions of possession of methamphetamine for sale pursuant to section 654, and that the abstract of judgment erroneously includes a drug program fee pursuant to Health and Safety Code section 11372.7, which the trial court did not impose when it orally pronounced judgment. Finally, we agree that the Health and Safety Code section 11370.2 enhancements must be struck and the sentences imposed thereon vacated. We shall remand this matter to the trial court for a new trial on the strike allegation, and for resentencing consistent with this opinion.

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges and Enhancement Allegations

By amended information, the People charged defendant with two counts of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 1 & 4), two counts of sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 2 & 5), and two counts of possession of methamphetamine for sale (Health & Saf. Code, § 11378; counts 3 & 6). The charges arose from events involving two separate drug transactions initiated in Yolo County and consummated in Sacramento County.

In connection with each count, it was further alleged that defendant had sustained prior convictions of violations of Health and Safety Code section 11351.5, possession of cocaine base for sale, on February 22, 2007, and January 17, 1992, within the meaning of former Health and Safety Code section 11370.2.[2] It was also alleged that defendant previously had been convicted of a serious felony on August 19, 2002, within the meaning of section 667, subdivisions (c) and (e)(1), and that defendant served three prior prison terms within the meaning of section 667.5, subdivision (b), on February 22, 2007, August 19, 2002, and January 17, 1992.

### Trial Evidence

Detective Bellamy of the Davis Police Department testified that, during all relevant times, he worked for YONET, the Yolo County Narcotic Enforcement Team. He testified that, in November 2012, as an undercover officer, he began to purchase methamphetamine from Marc Costa. During the course of his investigation, he purchased methamphetamine from Costa on five occasions. On two of those occasions,

---

[2] The information erroneously cited subdivision (a) of Health and Safety Code section 11370.2 rather than subdivision (c).

4

Costa did not have methamphetamine on hand, and he had to obtain it from his supplier. This case involves those two instances. Defendant was the supplier on each occasion.

**The First Transaction (Counts 1-3)**

On November 27, 2012, Bellamy called Costa from his car outside of his office in Yolo County. Bellamy recorded the call, and a recording of the call was played for the jury. Bellamy arranged a time to meet Costa. Bellamy testified that his plan was to buy methamphetamine from Costa. Later that day, Bellamy arrived at Costa's residence in Sacramento wearing a recording device. A recording of the transaction was played for the jury.

Discussing the transaction and what can be heard on the recording, Bellamy testified that he arranged to buy an eighth of an ounce of methamphetamine from Costa. While at Costa's Sacramento home, Costa made a phone call. After Costa completed the phone call, Costa asked Bellamy to accompany him to a liquor store in Sacramento in order to obtain the methamphetamine. Costa drove in one vehicle while Bellamy followed in his vehicle.

At the liquor store, Bellamy and Costa parked next to each other in the parking lot. Costa approached Bellamy's vehicle, and Bellamy gave Costa the buy money. Costa told Bellamy, "I ain't gonna burn you, that's on my daughter. I swear." He told Bellamy he would be about 10 minutes, "cause he's slow sometimes," apparently referring to his supplier. Bellamy waited in his vehicle while Costa walked around the corner.

After about 10 minutes, Costa returned and told Bellamy that the person he was meeting was not there yet, but he had talked to that person over the phone. While waiting, Costa asked Bellamy how long Bellamy had been selling and Bellamy said about a year. Regarding his supplier, Costa said, "He's usually not like this." He then left again, at which time, communicating on the surveillance wire with other officers, Bellamy noted that Costa had indicated that "he was re-upping too," meaning that Costa had to resupply himself. Bellamy explained to the jury, "Costa was a drug dealer, so he

5

was obviously out of drugs, and he was telling me that he had to purchase more methamphetamine himself."

Costa returned, again not having met up with his supplier. Costa then had Bellamy dial the supplier from Bellamy's phone because Costa's phone battery had run out. Costa spoke with someone on the other end of the call, saying, "It's Marc, again. Hey. Hello? I know, I just got other people waiting, that's all. I just got people waiting too."

Later, Bellamy received a call from the number he had dialed, and he asked Costa, "Is that your boy? Alright, is this your guy right here calling me . . . ?" Costa spoke to the caller on Bellamy's phone. Around this time, Bellamy observed a vehicle arrive in the parking lot, and he saw an individual exit the vehicle and walk towards the front doors of the liquor store. Costa then went into the liquor store.

California Highway Patrol Officer David Diaz, another YONET agent, watched the man walk into the store and later identified him as defendant. Diaz went into the store where he observed defendant and Costa standing next to each other in the back, facing one another. They were close enough to have a quiet conversation. The store shelves blocked Diaz's view of their hands. The two men separated when Diaz walked in.

Costa returned to Bellamy from the liquor store after approximately five minutes with several bags of methamphetamine, one of which he gave to Bellamy. On cross-examination, Bellamy acknowledged that he did not see what occurred in the liquor store, and he did not know whether anyone in the liquor store gave Costa drugs.

Detective Alisha Slater, who was the YONET case agent on this investigation, testified that she observed a silver 2012 Ford enter the liquor store parking lot when Bellamy was there. From the vehicle's license plate, she determined that it was registered to PV Holding Corporation, a rental car corporation in Los Angeles. Slater followed the vehicle after it left the parking lot and observed the driver engage in

6

counter-surveillance driving techniques in an apparent attempt to avoid being followed or to detect vehicles following him.

**The Second Transaction (Counts 4-6)**

Bellamy purchased methamphetamine from Costa again on the night of January 8, 2013. As before, Bellamy called Costa from Yolo County to set up the transaction.

Bellamy met Costa in the same liquor store parking lot in Sacramento. After Bellamy arrived, Costa placed a call which Bellamy believed to be to Costa's supplier. Costa asked Bellamy if he wanted to conduct the transaction like the last time, and Bellamy asked Costa if his "connect" would be upset if he accompanied Costa. Costa said it would not be a problem and suggested they go in Bellamy's car. Costa then got into Bellamy's car, and they drove to a school in a Sacramento residential area approximately six blocks from the liquor store.

While they were waiting in Bellamy's car, Costa placed a call, and Bellamy heard the recipient respond: "Hey man, quit blowing me up." Costa told the person on the phone, "I know man, I'm not blowing you up, but I came up here in *his* car and I left my keys in my car on accident at the liquor store." (Italics added.) The person then asked Costa, "Which one you at?" Costa, replied, "I'm at the school." The person then asked, "And what kind of car *your boy* in?" (italics added) and Costa responded, "I'm in a black car, a black Mustang. I'm right here." Costa asked if the person he was talking to was "pulling up right now," to which the person on the phone responded, "Yeah." A pickup truck pulled up next to Bellamy's car.

Bellamy gave Costa the buy money just before Costa got out of the car and went to the pickup. When Costa opened the passenger door of the pickup, the interior light illuminated and Bellamy observed defendant in the driver's seat. Defendant was the only occupant of the vehicle. Defendant and Bellamy looked at each other. Costa and defendant then drove down the street the length of the block, made a U-turn, and returned to Bellamy's location. Costa opened the truck's passenger door, and the dome light

7

illuminated and Bellamy saw defendant in the driver's seat. Again, both defendant and Bellamy looked at one another. Costa then got back into Bellamy's vehicle.

Costa gave Bellamy what appeared to be all of the methamphetamine he had, a single bag. When Bellamy asked Costa whether he "g[o]t some too," Costa responded, "I didn't get none. I'm doing bad right now cause I owe him money. So he ain't giving me nothing right now. But if you could kick me a little, that'd be cool." Costa told Bellamy that he recently lost money gambling and he owed defendant approximately $400. Bellamy testified that when someone brokers a deal for a buyer, it is typical for a buyer to "kick . . . down either a portion of the product or some money" to the broker. Instead of giving Costa a portion of the methamphetamine, Bellamy gave Costa $20 for his role in brokering the deal.

**Additional Evidence**

Bellamy testified that he made three other purchases from Costa. One took place in West Sacramento, Yolo County. The other two took place at Costa's home in Sacramento.

Detective Slater determined that PV Holding Corporation of Los Angeles owned the vehicles defendant drove during transactions. Slater later learned that defendant's wife or girlfriend worked for a rental car company through which she would get rental cars that defendant would use. When defendant was arrested four months later, he was driving another vehicle registered to PV Holding Corporation. After his arrest, defendant provided as his phone number the same number Bellamy had called at Costa's direction during the first transaction. Defendant admitted knowing Costa.

The parties stipulated that the substance Bellamy purchased from Costa during the first transaction consisted of 2.58 grams of methamphetamine, and that the substance Bellamy purchased from Costa during the second transaction consisted of 6.00 grams of methamphetamine.

Defendant presented no evidence.

8

**Verdicts, Bifurcated Trial on Enhancements, and Sentencing**

The jury found defendant guilty of two counts of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 1 & 4), two counts of sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 2 & 5), and two counts of possession of methamphetamine for sale (Health & Saf. Code, § 11378; counts 3 & 6).

The trial court had previously granted defendant's request to bifurcate trial on the enhancements, and defendant waived jury trial. The trial court found beyond a reasonable doubt that defendant had sustained two prior convictions for violation of Health and Safety Code section 11351.5 and thus found true the enhancement allegations pursuant to former Health and Safety Code section 11370.2. The trial court further found the strike allegation and two prior prison term enhancement allegations to have been proven beyond a reasonable doubt. However, seemingly based on the absence of a "five-year washout period," the trial court concluded that the prosecution failed to prove the third prior prison commitment allegation beyond a reasonable doubt.

Later, the court denied defendant's *Romero* motion[3] to dismiss the prior strike conviction allegation. The court sentenced defendant to an aggregate determinate term of 16 years, calculated as follows: on count 2, sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), the upper term of four years doubled to eight years because of the prior strike conviction pursuant to section 667, subdivision (e)(1); on count 5, sale of methamphetamine, a consecutive term of one year (one-third the midterm) doubled to two years because of the prior strike conviction; on counts 3 and 6, possession of methamphetamine for sale (Health & Saf. Code, § 11378), concurrent upper terms of three years doubled to six years; on counts 1 and 4, transporting methamphetamine

---

[3] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.

(Health & Saf. Code, § 11379, subd. (a)), the upper term of four years doubled to eight years, with execution of those sentences stayed pursuant to section 654; and two consecutive three-year terms pursuant to former Health and Safety Code section 11370.2, subdivision (c), for defendant's two prior convictions of Health and Safety Code section 11351.5. The trial court struck the two prior prison commitment findings in the interest of justice.

## DISCUSSION

### I. Venue

#### A. Additional Background and Defendant's Contentions

After the preliminary hearing, defendant filed a pretrial motion to dismiss the information on the ground that the Yolo County trial court lacked jurisdiction over him. Defendant asserted that the charges against him should be dismissed because he did not commit a public offense within the territorial jurisdiction where he was charged. Defendant pointed out that, while he was alleged to have participated in two drug transactions, he was not the individual contacted by law enforcement in Yolo County to arrange the transactions. Defendant also noted that, relevant to the acts alleged here, he was never in Yolo County. Additionally, the calls from Costa to him were both placed and received in Sacramento County. According to defendant, "[t]here was not a single fact in evidence at the preliminary hearing supporting the notion that [defendant] was linked to, or involved in a crime that occurred in Yolo County."

Defendant further asserted that, contrary to the prosecutor's contention at the preliminary hearing, the evidence was insufficient to establish an ongoing conspiracy between him and Costa. Defendant argued that a criminal conspiracy requires a common scheme or plan between two or more individuals to commit a crime. He asserted that a criminal conspiracy is not established where one individual sells drugs to a second individual, who, in turn, sells the drugs to a third person. According to defendant, in such a situation, there is no common scheme or plan between the first two individuals.

10

Defendant argued that this was, at most, what the evidence would tend to prove in this case.

The prosecutor opposed defendant's motion, asserting that an offense may be prosecuted in a county where preliminary arrangements for the crime were made, even where those arrangements did not constitute an essential element of the completed crime. According to the prosecutor, a crime could be prosecuted in any county affected by the transaction, regardless of where the acts constituting the essential elements of the crime took place. In asserting that Yolo County was a proper venue, the prosecutor relied on section 781, pertaining to offenses committed in more than one jurisdictional territory. He argued that acts necessary for the preparation of the crime, specifically the telephone calls from Bellamy to Costa to set up the drug transactions, were made from Yolo County, and without these phone calls, Costa would not have called defendant to arrange for the procurement of methamphetamine on the charged occasions. The prosecutor further asserted that, at the least, the evidence supported the theory that defendant was aiding and abetting Costa's crimes, if not acting as a co-conspirator, and defendant was responsible for the crimes committed by Costa regardless of where they occurred. Finally, the prosecutor asserted that the mere fact that Sacramento County would be a proper venue to prosecute defendant did not mean that Yolo County was an improper venue.

During oral argument on the motion, defendant argued that the cases on which the prosecutor relied in opposition to his motion were inapposite because, unlike the circumstances here, in those cases, some of the crimes, or at least some planning and preparation, occurred where the defendants were prosecuted. Conversely, here, defendant was never in Yolo County, never planned to commit any crimes in Yolo County, and did not perform acts which could be deemed planning crimes in Yolo County.

11

The prosecutor asserted that the connection to Yolo County was through Costa and Costa committed acts in preparation for the charged crimes by communicating with Bellamy who was in Yolo County at the time. According to the prosecutor, "by involving himself in . . . Costa's crimes [defendant], whether knowingly or not, has proven to be amenable to jurisdiction in Yolo County."

The trial court denied defendant's motion. The court ruled: "The jurisdiction over . . . Costa is solid and part of the acts he did in committing the crime alleged here have to do with interactions with [defendant]. Whether that's in another county or not, Yolo County has jurisdiction over . . . Costa, and participation in the crime out of Yolo County by [defendant] means that he is also under Yolo County's jurisdiction, and so this case is going to go forward."

On appeal, defendant asserts that the judgment should be reversed because the Yolo County Superior Court did not have territorial jurisdiction over the offenses at issue here. He maintains that the evidence was insufficient to support any inference that defendant entered into an agreement with Costa to sell methamphetamine to Bellamy. Therefore, according to defendant, the evidence does not establish territorial jurisdiction in Yolo County. Defendant asserts that, at most, the evidence supports the conclusion that he sold methamphetamine to Costa in Sacramento County following Costa's calls to him from Sacramento County. In other words, according to defendant, any crimes in which he was implicated took place entirely within Sacramento County. Defendant contends that he cannot be connected to the only relevant occurrence in Yolo County— the calls Bellamy placed to Costa—because the evidence is insufficient to establish defendant's guilt under either a conspiracy theory or an aider-and-abettor theory. Defendant mistakenly relies on the substantial evidence standard to support this assertion.

### B. Venue Principles and Standard of Review

"[E]xcept as otherwise provided by law the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed."

12

(§ 777.) "The words 'jurisdictional territory' when used with reference to a court, mean the city and county, county, city, township, or other limited territory over which the criminal jurisdiction of the court extends, as provided by law, and in case of a superior court mean the county in which the court sits." (§ 691, subd. (b).) "The terms 'venue' and 'territorial jurisdiction' are synonymous." (*Thomas, supra*, 53 Cal.4th at p. 1282.) " 'Venue or territorial jurisdiction establishes the proper place for trial, but . . . does not affect the power of a court to try a case.' " (*Ibid.*) To avoid confusion, courts generally use the term "venue" to refer to the question of territorial jurisdiction. (*People v. Simon* (2001) 25 Cal.4th 1082, 1096-1097 (*Simon*).)[4] Accordingly, we will refer to the issue before us as one involving proper venue, not jurisdiction.

Courts have identified several purposes of the venue requirement. It " ' "promotes the convenience of both parties in obtaining evidence and securing the presence of

---

[4] As our high court has noted, "In analyzing the procedural requirements governing venue, it is important to recognize . . . that although the applicable California statutes generally employ the terms 'jurisdiction' and 'jurisdictional territory' in designating the proper venue for the trial of a criminal proceeding [citation], the issue of venue in criminal as well as in civil cases does *not* involve a question of 'fundamental' or 'subject matter' jurisdiction over a proceeding. As a leading treatise explains: 'If the crime is one over which California can and does exercise its legislative jurisdiction because it was committed in whole or in part within the state's territorial borders, California courts have jurisdiction to try the defendant. [Citation.] Moreover, if the charge is brought in a competent court (i.e., superior court for felonies . . . ), *that court*, *no matter where located in the state*, may have subject matter jurisdiction of the offense. [Citation.] [¶] Thus, *venue is not jurisdictional in the fundamental sense*; and, both in civil and criminal cases, a change of venue from the superior court of one county to the same court in another county does not affect its jurisdiction over the subject matter of the cause.' " (*Simon, supra*, 25 Cal.4th at p. 1096, quoting 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Jurisdiction and Venue, § 45, p. 135.) "Although this point is a basic one, use of the term 'jurisdiction' at times has created confusion in the venue context . . . . [A]ll modern decisions recognize that criminal venue statutes do not involve a court's jurisdiction in the fundamental sense of subject matter jurisdiction." (*Simon*, at pp. 1096-1097, fns. omitted.)

13

witnesses." ' " (*Thomas, supra*, 53 Cal.4th at p. 1287.) "It 'provide[s] for trial in a county that bears a reasonable relationship' to the offenses." (*Ibid*.) It also serves to " ' " 'safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place.' " ' " (*Ibid*.) Additionally, the venue requirement provides "participation on the part of the community affected" (*People v. Posey* (2004) 32 Cal.4th 193, 204 (*Posey*)), and thus protects " 'the interests of the community in which a crime or related activity occurs, "vindicat[ing] the community's right to sit in judgment on crimes committed within its territory." ' " (*Thomas*, at p. 1282; *Posey*, at p. 210.)

"There are statutory exceptions to the general rule that a crime should be prosecuted in the county where it is committed." (*Thomas, supra*, 53 Cal.4th at p. 1283.) Section 781 is one such exception. (*Ibid*.) It provides in pertinent part: "[W]hen a public offense is committed in part in one jurisdictional territory and in part in another jurisdictional territory, *or the acts or effects* thereof constituting or *requisite to the consummation* of the offense occur in two or more jurisdictional territories, the jurisdiction for the offense is in any competent court within either jurisdictional territory." (§ 781, italics added.) Our high court has counseled that " ' "[s]ection 781 is remedial and, thus, we construe the statute liberally to achieve its purpose of expanding criminal jurisdiction beyond rigid common law limits. [Citations.] We therefore interpret section 781 in a commonsense manner with proper regard for the facts and circumstances of the case rather than technical niceties." ' " (*Thomas*, at p. 1283.)

In interpreting section 781, our high court has "found proper venue in a county where 'only preparatory acts have occurred' and where those preparatory acts were not themselves elements of the offense." (*Thomas, supra*, 53 Cal.4th at p. 1284.) Additionally, the court has held that "venue can be based on the *effects* of preparatory acts (what [the court has] called 'preparatory effects')," such as a defendant's actions in receiving pages from an undercover officer located in a particular county or placing calls to the officer in that county in order to arrange for drug transactions, notwithstanding the

14

fact that the drug transactions were consummated in a different county. (*Id*. at p. 1285; see *Posey, supra*, 32 Cal.4th at p. 219.)

At trial, "[t]he prosecution has the burden of proving the facts supporting venue by a preponderance of the evidence." (*Thomas, supra*, 53 Cal.4th at p. 1283.) However, as we have noted, " '[o]n review, a trial court's determination of territorial jurisdiction will be upheld as long as there is "*some evidence*" to support its holding.' " (*Ibid*., italics added; *Chavarria, supra*, 213 Cal.App.4th at p. 1369.)

### C. Direct Actions, Preparatory Acts, and Preparatory Effects

It is undisputed that, at all relevant times, defendant was not in Yolo County and did not commit any act in Yolo County in connection with this case. It is also undisputed that defendant did not call Bellamy while Bellamy was in Yolo County and Bellamy did not call defendant from Yolo County. Indeed, Bellamy and defendant never spoke to one another. Nor did Costa call and speak to defendant from Yolo County. In short, defendant did not personally undertake any action in this case directly connecting him to Yolo County.

The parties discuss cases in which preparatory acts or preparatory effects were sufficient to render particular counties appropriate venues pursuant to section 781. Most of these cases involve a defendant who engaged in direct acts in the county in which the case was tried or whose acts directly affected that county, such as *Thomas, supra*, 53 Cal.4th 1276, and *Posey, supra*, 32 Cal.4th 193. In this part of the Discussion, we shall consider *Thomas* and *Posey* and direct actions, preparatory acts, and preparatory effects. In part I.D. of the Discussion, *post*, we shall discuss *Chavarria, supra*, 213 Cal.App.4th 1364, a case upon which the People rely involving acts of an accomplice, which is more on point here.

In *Thomas, supra*, 53 Cal.4th 1276, the defendant lived in Madera County. (*Id*. at p. 1279.) The trial court found that Madera County was the defendant's " 'base of operations' " where he participated in gang activities, including the sale of drugs. (*Id*. at

15

p. 1287.)  The defendant was found to be in possession of a key and a receipt for a storage locker in Fresno County which contained drugs and a firearm.  (*Ibid*.)  Our high court rejected the Court of Appeal's determination that the drugs and firearm found in Fresno County did not provide a basis for prosecuting the defendant in Madera County for possession for sale of a controlled substance and possession of a firearm by a convicted felon.  (*Ibid*.)  The *Thomas* court concluded that Madera County was a proper venue under section 781 because the defendant committed preparatory acts in Madera County and because the effects of the defendant's unlawful possession of drugs and the firearm in the Fresno County storage locker "would be felt in Madera County" based on the defendant's "larger plan to sell drugs in Madera County." (*Thomas*, at p. 1287.)  The defendant's preparatory acts in Madera County on which our high court relied in its analysis included obtaining an apartment in which cash was found hidden in a clothes dryer.  He also secured two cell phones and a pager in Madera County.  (*Ibid*.)  Additionally, our high court relied on effects felt in Madera County, which essentially consisted of the defendant's activities in selling drugs and participating in gang activities in that county.  (*Ibid*.)  The *Thomas* court found that ample evidence supported the trial court's finding that the defendant lived in and sold drugs in Madera County, and that the " 'only thing absent [was] his inventory,' " which was " 'just across the county line.' " (*Ibid*.)

In *Posey, supra*, 32 Cal.4th 193, the defendant's associate, in San Francisco, responding to pages from an undercover police officer who was in Marin County, called the officer and had him speak over the phone with the defendant about a purchase of cocaine base.  (*Id*. at p. 202.)  The officer agreed to purchase two ounces of cocaine base from the defendant, and the defendant agreed to meet the officer at a location in Marin County.  (*Ibid*.)  Later, the defendant called the officer back and changed the location of the sale to a site in San Francisco, where the transaction was ultimately consummated. (*Ibid*.)  Several days later, the officer, while in Marin County, again paged the

16

defendant's associate, who was in San Francisco County. She called the officer back and again had him speak with the defendant. (*Ibid.*) The officer and the defendant agreed to another drug transaction. (*Ibid.*) As he had before, the officer tried to get the defendant to come to Marin County. (*Ibid.*) The defendant refused, and, ultimately, the officer agreed to meet the defendant at the location of the previous transaction in San Francisco where the transaction was consummated later that evening. (*Id*. at pp. 202, 222.) Our high court concluded that venue in Marin County was proper under section 781, notwithstanding the fact that the drug transactions took place in San Francisco. (*Posey*, at pp. 220-221.) The *Posey* court reasoned that the words in section 781, " 'effects . . . requisite to the consummation' of a crime establishing venue in a county should be liberally construed to embrace *preparatory* effects, such as the placement of a telephone call into a county leading to a crime." (*Posey*, at p. 219.) Thus, the court concluded that the defendant's several telephone calls to Marin County "constituted 'effects . . . requisite to the consummation' of the crimes in question" within the meaning of section 781. (*Posey*, at p. 221.)

Importantly, the *Posey* court rejected the defendant's argument that section 781 requires the defendant to engage in acts deliberately targeting a county or its residents. (*Posey, supra*, 32 Cal.4th at p. 220.) There is no requirement that "the defendant possess any mental state whatever with respect to a county, for purposes of venue. The requirement of 'effects' in a county 'requisite to the consummation' of a crime satisfies the need for a reasonable relationship between the crime and the county." (*Ibid.*) The court reemphasized this point later in the opinion, stating, "Under section 781, venue turns on the presence or absence, in a county, of acts or effects constituting the crime or requisite to the commission of the crime—not on the defendant's state of mind or on the soundness of any beliefs that he or she might hold as to the location of those acts or effects." (*Id*. at p. 221.)

As we have noted, in each of these cases, the defendants themselves engaged in preparatory acts, or directly committed acts with preparatory effects, in the county where they would eventually face prosecution. Here, it is undisputed that the only connection to Yolo County was Bellamy's calls from Yolo County to Costa in Sacramento County to arrange the purchase of methamphetamine from Costa. As defendant asserted in his motion before the trial court, he was not contacted by Bellamy from Yolo County to arrange the transactions, and, relevant to the acts alleged here, he was never in Yolo County. Costa placed his calls to defendant from Sacramento County. On these facts, no direct acts by defendant, or effects resulting directly from defendant's actions, occurred in Yolo County. However, as we discuss next, venue was nonetheless proper because of defendant's participation with an accessory who committed direct acts, and whose conduct would have had direct effects, in Yolo County.

### D. Aiding and Abetting

"A person can be guilty of a crime as a perpetrator or as an aider and abettor." (*People v. Nelson* (2015) 240 Cal.App.4th 488, 496, citing § 31.) " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Hill* (1998) 17 Cal.4th 800, 851.) A defendant does not need to actually have been present when the crime was committed to be liable as an aider and abettor. (§ 31; *People v. Bohmer* (1975) 46 Cal.App.3d 185, 199; *People v. Lopez* (1963) 213 Cal.App.2d 668, 673-674 [defendant was liable as an aider and abettor even though he was not present at the time of a sale to an undercover officer].) One who aids and abets in the commission of a crime may be subject to prosecution for that crime in any county having jurisdiction over the offense. (*People v. Benenato* (1946) 77 Cal.App.2d 350, 364 [if the defendant did aid and abet the attempt to commit the crime of pandering, she must be deemed to have been

18

a principal in that crime and subject to prosecution therefor in any county having jurisdiction of the offense, citing § 31], disapproved on another ground in *In re Wright* (1967) 65 Cal.2d 650, 654-655 & fn. 3.)

The People rely on *Chavarria, supra*, 213 Cal.App.4th 1364, for the proposition that venue is proper when a defendant has aided and abetted another person who committed preparatory acts or whose conduct had preparatory effects in the county where the case was tried. In *Chavarria*, the police were investigating a Los Angeles-based enterprise involved in selling heroin to residents of Ventura County through means of a delivery service that would be dispatched upon placement of a phone order for the drug. (*Id*. at p. 1367.) In the presence of police in Ventura County, an informant placed three calls from Ventura County to the service and negotiated a purchase. (*Id.* at p. 1367 & fn. 2.) As arranged, the sale occurred at a location in Los Angeles County. (*Id*. at p. 1367.) The defendant arrived at the designated location and sold heroin to the informant, after which he was arrested. (*Ibid*.) Just before the sale, the defendant made a cell phone call in which he asked whether he was supposed to sell 11 grams for the price of 10. A phone later recovered from the defendant revealed that the call was made to the same number the informant had called to place the order. (*Ibid*.) The defendant did not take part in the earlier phone negotiations in which the informant had arranged for the purchase. (*Id*. at p. 1366.)

Applying section 781 and relying on the analysis in *Posey*, the *Chavarria* court determined that the trial court correctly denied the defendant's motion to dismiss on the ground that Ventura County was not a proper venue. (*Chavarria, supra*, 213 Cal.App.4th at pp. 1370-1371.) The *Chavarria* court acknowledged that, unlike the circumstances in *Posey*, the defendant did not initiate or participate in any of the telephone calls upon which the finding of proper venue in Ventura County was based. (*Chavarria*, at p. 1370.) However, the *Chavarria* court determined that "this distinction is of no moment. Although the court in *Posey* emphasized the fact that the defendant in that case had made

19

several phone calls to the county in which he was prosecuted [citation], nothing in the opinion suggests that this fact would have been essential to a finding of proper venue in that case. *Section 781 does not refer to any requirement that the acts or effects requisite to consummation of the offense must directly involve the defendant who is charged with the crime.*" (*Chavarria*, at p. 1370, italics added.) The court concluded: "[*T*]*he fact that appellant's accomplice negotiated the drug sale over the phone with an individual physically present in Ventura County is sufficient to establish venue in that county.* Although the call was made from Ventura County to Los Angeles County, the call itself—i.e., the discussions during which the drug sale was negotiated—took place in both counties. Giving section 781 the requisite liberal construction, this qualifies as a preparatory act or effect 'requisite to the consummation of the offense occur[ring] in two or more jurisdictional territories.' Accordingly, the case was subject to prosecution in either of the counties in which the call took place." (*Chavarria*, at p. 1371, italics added.)

Among other things, in its analysis the *Chavarria* court noted that the court in *Posey* "made clear we should not 'insert[] into section 781 something that is not present' " (*Chavarria, supra*, 213 Cal.App.4th at p. 1370), referring to imposing a requirement that the acts or effects establishing proper venue must directly involve the charged defendant. Nor should courts "construe the statute in a manner 'that contracts venue rather than extends it.' (*Posey*, [*supra*, 32 Cal.4th] at p. 220.)" (*Chavarria*, at pp. 1370-1371.) The *Chavarria* court also noted that a defendant's mental state is irrelevant to the determination of venue. (*Id.* at p. 1371, citing *Posey*, at p. 220.)

Discussing the justifications for the venue requirement, the court in *Chavarria* observed: "The residents of Ventura County undoubtedly have a legitimate interest in the local prosecution of individuals who are responsible for the influx of illegal drugs into their community, particularly when those individuals act pursuant to a criminal enterprise that allows purchasers to initiate and negotiate drug sales from within that community." (*Chavarria, supra*, 213 Cal.App.4th at p. 1371.)

20

Defendant here points out that *Chavarria* is factually distinguishable from the instant case. Unlike the instant case, the defendant in *Chavarria* was the person who delivered the drugs to the out-of-county buyer on behalf of the accomplice. Additionally, during the transaction, the defendant in *Chavarria* called the phone number the buyer had originally called to place the order to confirm the agreed-upon price. According to defendant, there was no similar evidence of accomplice liability in the instant case.

We agree the instant case is factually different from *Chavarria*. Moreover, the parties did not cite and we have not found any cases involving the scenario presented here, where the supplier of the drugs has no contact with the out-of-county buyer. However, we find this distinction to be without a difference, because, like in *Chavarria*, venue here was based on the actions of an accomplice to the offenses for which defendant was convicted. Based on the calls from Bellamy in Yolo County to Costa in Sacramento County to arrange the drug transactions, Yolo County was a proper venue for prosecution of Costa because those calls constituted preparatory acts or they had preparatory effects in Yolo County, notwithstanding the fact that the drug purchases took place in Sacramento County. (See *Posey, supra*, 32 Cal.4th at pp. 219-222.) Thus, we focus our review on determining whether there is evidence that supports a finding that defendant (the supplier) aided and abetted Costa (the dealer) in selling to Bellamy (the out-of-county buyer).[5] Before we discuss the evidence as to each transaction, we revisit our standard of review.

Without citation to authority related to venue matters, defendant applies to the venue issue here the standard employed in reviewing for the sufficiency of evidence to

---

[5] Because we conclude there was evidence supporting a finding that defendant aided and abetted Costa in selling methamphetamine to Bellamy, we need not address the alternative theory that defendant and Costa conspired to sell methamphetamine to a third person. Aiding and abetting theory connects defendant to his accomplice.

21

support verdicts of guilt or factual findings in other contexts. For example, defendant relies on a civil case for the proposition that the resolution of questions of fact concerning the establishment of historical or physical facts is to be reviewed under the substantial evidence test. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [addressing the standard of review on appeal for a trial court's classification of a particular item of personal property as a fixture of real property for purposes of taxation].) Defendant goes on to point out that substantial evidence must be reasonable, credible, and of solid value, and may not be based on speculative possibilities or conjecture, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578 (setting forth the constitutional standard of review for determining the sufficiency of the evidence supporting a criminal conviction), and *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 (applying the substantial evidence test to appellate review of State Personnel Board determinations). But as we have noted, on appellate review " 'a trial court's determination of territorial jurisdiction will be upheld as long as there is "*some evidence*" to support its holding.' " (*Thomas, supra*, 53 Cal.4th at p. 1283, italics added; *Chavarria, supra*, 213 Cal.App.4th at p. 1369.) Accordingly, we do not apply the substantial evidence test here.[6] Rather we look for "some evidence" supporting the trial court's determination that Yolo County was a proper venue.

As noted, defendant acknowledges that venue in Yolo County would be proper as to him if he was an accomplice to Costa's crimes as to which there was proper venue in Yolo County. However, he asserts the evidence is insufficient to support a finding that defendant participated in Costa's crimes. He asserts that the evidence is insufficient to

---

[6] The jury was instructed on both aider and abettor liability and conspiracy liability. However, defendant does not challenge his convictions on the ground that there was not substantial evidence supporting a finding of guilt based on his liability under these theories.

22

show that defendant knew Costa would sell the methamphetamine to Bellamy and that he had the specific intent that the drugs be sold to Bellamy. Defendant argues that only speculation supports the inference that he was aware that Costa would sell the methamphetamine to Bellamy. We disagree. As we shall discuss, reasonable inferences establish defendant's knowledge of Costa's purpose and defendant's specific intent to aid Costa in selling the methamphetamine to a third party.

We first note that a reasonable inference can be drawn from the evidence that defendant had a supplier-dealer relationship with Costa; he supplied Costa with methamphetamine to be sold to third parties. The evidence showed that defendant supplied Costa twice, once in November and again during the following January. While waiting for his supplier to show up at the liquor store during the first transaction, Costa told Bellamy "he's slow sometimes." Later during the first transaction, again referring to his supplier and apparently to reassure Bellamy, Costa said, "He's usually not like this." While waiting for Costa to return from around the corner, Bellamy indicated on the wire that Costa was re-upping, i.e., resupplying himself. As Bellamy explained to the jury, "Costa was a drug dealer, so he was obviously out of drugs, and he was telling me that he had to purchase more methamphetamine himself." During the second transaction, while Costa and Bellamy were parked waiting for defendant, Costa spoke with defendant on the phone. Defendant asked, "Which one you at?" and Costa replied, "I'm at the school." From this exchange, it can be reasonably inferred that the location where Costa had Bellamy park was one of multiple locations where Costa was accustomed to meeting defendant to obtain drugs from him. This evidence of an ongoing supplier-dealer relationship buttresses the evidence showing aiding and abetting as to the two transactions at issue here.

Regarding the first transaction, when Costa returned to the liquor store parking lot after again not having met with his supplier, he had Bellamy dial the supplier from Bellamy's phone because his phone battery had run out. When the call was returned,

23

Bellamy confirmed with Costa that it was the supplier calling by asking, "Is that your boy? Alright, is this your guy right here calling me . . . ?" He handed the phone to Costa who then spoke with the person on the other end of the call. Costa said, "It's Marc, again. Hey. Hello? I know, *I just got other people waiting, that's all. I just got people waiting too*." (Italics added.) Costa's reference to having other people waiting is some evidence that defendant knew Costa was going to sell the methamphetamine to third parties, and thus when defendant ultimately supplied methamphetamine to Costa on that occasion, defendant knowingly and intentionally aided and abetted Costa in selling the drug to a third party.

Regarding the second transaction, Bellamy asked Costa if it would be alright to accompany him to his meeting with his "connect." While Costa and Bellamy were waiting in Bellamy's car, Costa placed a call, and Bellamy heard the recipient respond: "Hey man, quit blowing me up." Costa told the person on the phone, "I know man, I'm not blowing you up, but I came up here in *his* car and I left my keys in my car on accident at the liquor store." (Italics added.) After confirming Costa's location, the individual on the other end of the call then asked, "And what kind of car *your boy* in?" (Italics added.) It is reasonable to infer from Costa's use of the pronoun "his" that he had previously told defendant about the third party he was with. It would certainly be odd to say, "I came up here in *his* car" without having earlier told defendant about that person. The inference that Costa told defendant about his buyer is reinforced by defendant's question, asking "what kind of car *your boy* in?" This is additional evidence establishing that defendant knew Costa was a middle man on this occasion who had a buyer for the methamphetamine defendant was going to supply.

When Costa returned from a short ride with defendant, he had only one bag of methamphetamine, unlike on the first occasion where Costa retained the other bags he had obtained from defendant. He turned over that single bag to Bellamy. When Bellamy asked Costa whether he got any, Costa said he had not. He explained, "I'm doing bad

24

right now cause I owe him money. *So he ain't giving me nothing right now*. But if you could kick me a little, that'd be cool." (Italics added.) Costa had recently lost money gambling, and he owed defendant approximately $400. Costa's reference to his debt and the fact that defendant was not providing him with any drugs "right now" is additional evidence establishing that defendant knew he was not providing methamphetamine to Costa, but rather he was knowingly aiding and abetting Costa in providing methamphetamine to a third party.

Defendant asserts that the telephone exchange did not imply that Costa was going to sell the methamphetamine to Bellamy. According to defendant, it was a way for Costa to inform defendant of "an independent reason for . . . Bellamy to be arriving in the same car as . . . Costa after leaving his keys in his own car." The reference to the driver and owner of the car Costa was in as " 'your boy,' " according to defendant, implied nothing more than a reference to the person who gave Costa a ride. These may be inferences that could be drawn from the evidence, but they do not negate the inferences we discussed *ante*. Indeed, defendant's assertion does not explain Costa's use of the word "his" in explaining, "I came up here in *his* car." If Costa was merely trying to explain the car he was in, it would be more reasonable to expect him to describe the car and perhaps say he was with someone else. As we have said, in context, the use the word "his" suggests Costa had already told defendant about the third party he was with. Under the circumstances, it is reasonable to infer that he had told defendant about the third party because he was brokering a drug transaction between that person and defendant. Similarly, it can be reasonably inferred that when defendant asked, "[W]hat kind of car your boy in?" he was asking about the car Costa's buyer was in. There would be no reason to reference "your boy" if defendant was there just to do a deal with Costa and merely needed to know what type of car he was in, as defendant asserts.

Defendant also asserts that no inference could be drawn from the evidence that Costa was in debt to defendant. Defendant acknowledges that it can be inferred that,

25

when he met with Costa during the short ride up the street and back, Costa gave defendant money and defendant gave Costa the methamphetamine.  But defendant maintains that nothing about the fact Costa had an outstanding debt to defendant implies that defendant knew Costa "would turn around and sell the methamphetamine to . . . Bellamy."  We disagree.  It is reasonable to infer that if Costa owed defendant money, defendant would not have sold Costa methamphetamine; defendant would have just taken Costa's money as payment on the debt without giving Costa a bag of methamphetamine.  The evidence here suggests that defendant took the money from Costa knowing that it was the buyer's money, not Costa's, and that the methamphetamine he handed over to Costa was intended for the buyer.

We have noted what we consider to be the reasonable inferences to be drawn from the evidence.  We are not required to reconcile the various contrary inferences defendant raises.  Again, our review requires only that we look for some evidence supporting the trial court's venue ruling.  (*Thomas, supra*, 53 Cal.4th at p. 1283; *Chavarria, supra*, 213 Cal.App.4th at p. 1369.)  That there are other inferences that could also be drawn does not negate a determination that there is some evidence supporting the trial court's determination that Yolo County was a proper venue.  Indeed, even if we were required to engage in a substantial evidence review as defendant maintains, we would look at the record in the light most favorable to the judgment and all reasonable inferences would be drawn in its favor.  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295; *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1171.)  We could not reverse merely because the circumstances might *also* support a contrary finding (*People v. Salazar* (2016) 63 Cal.4th 214, 245), and reversal would be unwarranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the trial court's finding.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  In any event, we conclude that there was *more than* just some evidence to support the trial court's venue ruling here.

26

In concluding that Ventura County was a proper venue in *Chavarria*, the court observed, "The drug sale of which [the defendant] was convicted was negotiated by his accomplice over the phone with an individual who was physically present in Ventura County. *But for that call, there could have been no sale*," and this constituted "some evidence sufficient to support the finding that preparatory acts or effects requisite to commission of [the defendant]'s crimes took place in Ventura County." (*Chavarria, supra*, 213 Cal.App.4th at p. 1371.) The People contend the same can be said here, and we agree. But for Bellamy's call to Costa, there would have been no sale to Bellamy for defendant to supply.

While the principal justification for the venue requirement is to protect the accused from the hardship and unfairness of being charged in a remote county, it also protects the interests of the community in which a crime or related activity occurs. (*Chavarria, supra*, 213 Cal.App.4th at p. 1371.) The flow of drugs into Yolo County was an effect of the phone calls that initiated the transactions in which defendant involved himself. Like the residents of Ventura County in *Chavarria*, the residents of Yolo County undoubtedly have a legitimate interest in the local prosecution of individuals who are responsible for the influx of illegal drugs into their community. (*Ibid*.) We conclude that Yolo County was a proper venue because defendant aided and abetted an accomplice who engaged in preparatory acts and whose conduct had preparatory effects in that county.

## II. Sufficiency of the Evidence on the Strike Allegation

### A. Additional Background and Defendant's Contentions

To establish that defendant previously had been convicted of a serious felony within the meaning of sections 667, subdivisions (c) and (e)(1), the prosecutor submitted as People's exhibit No. 7 portions of the record of conviction in the Sacramento County Superior Court upon a plea of guilty, of a violation of section 243, subdivision (d), in August 2002. The record of conviction included minute orders, an abstract of judgment,

and a certified copy of the felony information. The information alleged that on or about January 7, 2002, defendant willfully and unlawfully used force and violence upon a named individual "resulting in the infliction of serious bodily injury on such person." The information further alleged that the violation of section 243, subdivision (d), constituted a serious offense within the meaning of section 1192.7. As defendant observes, the record of conviction does not contain a rendition of the facts underlying the conviction.

The prosecutor also submitted People's exhibit No. 8, a section 969b packet pertaining to defendant and including the 2002 abstract of judgment as well as a 2007 abstract of judgment pertaining to his conviction of a violation of Health and Safety Code section 11351.5. The prosecutor noted that defendant's sentence on his 2007 conviction had been doubled, suggesting that it was doubled based on the 2002 conviction, and that the 2002 conviction thus constituted a prior strike.

Defense counsel asserted, with regard to the 2002 conviction of a violation of section 243, subdivision (d), that the exhibits did not indicate whether defendant pled guilty to a strike or a non-strike. Defense counsel further asserted that, for that conviction to qualify as a strike, defendant would have had to personally inflict great bodily injury, implying that there was no indication in the record that he had done so. Based on the failure of proof on the personal infliction element, defense counsel asserted that the strike prior had not been established beyond a reasonable doubt. Defense counsel characterized the fact that his 2007 sentence was doubled as merely circumstantial evidence that the 2002 conviction constituted a strike. He further asserted that this could be the result of an error on the minute order. Defense counsel emphasized the applicable beyond-a-reasonable-doubt burden of proof.

The trial court stated that, based on the fact that government and court documents are presumed to be accurate, it accepted the information contained in exhibit Nos. 7 and 8 to be true. The court acknowledged the absence of direct evidence that defendant

28

personally inflicted great bodily injury in the commission of the act which resulted in his 2002 conviction, but stated that there was circumstantial evidence in exhibit No. 8 tending to prove as much, specifically the fact that his 2007 sentence was doubled. The trial court found that the prosecution had proved beyond a reasonable doubt that the 2002 conviction was a strike.

Defendant asserts that the evidence was legally insufficient to support the true finding on the allegation that he was previously convicted of a serious felony, a strike prior, within the meaning of section 667, subdivisions (c) and (e)(1), because the evidence did not establish that he personally inflicted great bodily injury in connection with his prior conviction of a violation of section 243, subdivision (d). Personal infliction of great bodily injury is required to make such a conviction a serious felony under in section 1192.7, subdivision (c). Defendant argues that one may aid and abet a battery within the meaning of section 243, subdivision (d), without personally inflicting great bodily injury. Defendant further asserts that the trial court, in relying on the purported effect of the 2002 conviction on his sentencing in 2007, improperly based its determination on evidence outside of the 2002 record of conviction. The Attorney General concedes the point. We agree.

## B. Analysis

The People bear the burden of proving all elements of an alleged sentence enhancement beyond a reasonable doubt. (*People v. Miles* (2008) 43 Cal.4th 1074, 1082.) "A prior is a 'strike' if it is either a 'violent felony' under . . . section 667.5 or a 'serious felony' under . . . section 1192.7." (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1525, citing §§ 667, subd. (d)(1), 1170.12, subd. (d)(1).) Section 1192.7 provides that "any felony in which the defendant *personally inflicts great bodily* injury on any person, other than an accomplice, or any felony in which the defendant personally uses a firearm," constitutes a " 'serious felony' " within the meaning of that section. (§ 1192.7, subd. (c)(8), italics added.) Defendant's prior conviction at issue here was for violation

29

of section 243, subdivision (d). At the time of defendant's 2002 conviction, that section provided: "When a battery is committed against any person *and serious bodily injury is inflicted on the person*, the battery is punishable by imprisonment in a county jail not exceeding one year or imprisonment in the state prison for two, three, or four years." (Former § 243, subd. (d), italics added.)

Thus, defendant's conviction of a violation of section 243, subdivision (d), would qualify as a serious felony within the meaning of section 1192.7, subdivision (c)(8), if the serious bodily injury inflicted on the victim also qualified as great bodily injury *and* such injury was personally inflicted by defendant. The mere fact of the conviction, in and of itself, is insufficient to establish, beyond a reasonable doubt, that defendant personally inflicted great bodily injury on the victim. As defendant observes, and as the Attorney General acknowledges, in addressing another subdivision of section 243, our high court has stated that "one may aid and abet the assault without *personally* inflicting great bodily harm or using a firearm." (*People v. Rodriguez* (1998) 17 Cal.4th 253, 261.) Thus, as in *Rodriguez,* the fact of defendant's conviction alone was not sufficient to establish that he had pled guilty to a serious felony within the meaning of section 1192.7. (*Rodriguez*, at p. 261.) The record of conviction pertaining to the prior conviction did not contain any evidence, beyond the fact of the conviction, to establish that defendant personally inflicted great bodily injury (or personally used a firearm), and thus that it constituted a serious felony within the meaning of section 1192.7. For example, the record did not contain a transcript of the plea showing a factual basis or a reference to a preliminary hearing transcript as the factual basis along with the transcript. Thus, the record of conviction was insufficient to establish, beyond a reasonable doubt, that defendant's prior conviction constituted a serious felony within the meaning of section 1192.7.

The trial court, in concluding that the prosecution had established the existence of a prior strike conviction, relied on the purported effect of the 2002 conviction for battery

with serious bodily injury on defendant's subsequent sentencing in 2007. But the sentencing on the 2007 conviction was outside the record of defendant's 2002 conviction. "[I]n determining the truth of a prior conviction allegation, the trier of fact may 'look beyond the judgment to the entire record of the conviction' [citation] '*but no further.*' " (*People v. Trujillo* (2006) 40 Cal.4th 165, 177, quoting *People v. Guerrero* (1988) 44 Cal.3d 343, 355-356.) Thus, we conclude that the evidence was insufficient to establish that defendant's 2002 conviction was a qualifying prior strike conviction.

In his opening brief, defendant asserts that remand for retrial on the prior strike allegation would violate the double jeopardy clauses of the state and federal Constitutions. The Attorney General asserts that the matter should be remanded for a new trial on the prior serious felony conviction enhancement. Responding to defendant's double jeopardy argument, the Attorney General points out that, in *People v. Barragan* (2004) 32 Cal.4th 236 (*Barragan*), our high court rejected the same double jeopardy claim advanced by defendant here, holding that retrial of a strike allegation is permissible where the trier of fact's finding is reversed on appeal due to insufficiency of the evidence. (*Id.* at p. 239.) The *Barragan* court further noted that the United States Supreme Court had concluded that, in the noncapital sentencing context, such retrial does not violate the double jeopardy clause of the federal Constitution. (*Id.* at p. 241, discussing *Monge v. California* (1998) 524 U.S. 721 [141 L.Ed.2d 615].) For double jeopardy purposes, reversal of a sentencing enhancement true finding is not analogous to the reversal of a substantive conviction for insufficient evidence because a defendant cannot be acquitted of his or her prior conviction status " ' "any more than he [or she] can be 'acquitted' of being a certain age or sex or any other inherent fact." ' " (*Barragan*, at p. 242.) Our high court in *Barragan* further concluded that, because retrial of a prior conviction allegation in noncapital cases does not violate the double jeopardy, it also does not violate "the constitutional requirement of fundamental fairness, equitable principles of res judicata and law of the case, and relevant statutory provisions." (*Id.* at pp. 239, 241, 243-259.)

As the Attorney General noted, and defendant acknowledges in his reply brief, we are bound to follow our high court's decision which has not been overruled. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, we agree with the Attorney General and with defendant's acknowledgment in his reply brief that the matter must be remanded for a new trial on defendant's prior strike conviction enhancement allegation.

### III. Section 654

Defendant asserts that he was not properly subject to multiple punishments for sales and possession for sale of the same drugs on the same occasions. He asserts that rather than imposing concurrent sentences on counts 3 and 6, which were based on the same acts and courses of conduct as counts 2 and 5, respectively, the trial court should have stayed execution of his sentences pursuant to section 654. The Attorney General concedes the point, and again we agree.

Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Thus, section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) If all of the crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment. (*Ibid.*)

Defendant did not raise section 654 before the trial court. However, the erroneous failure to stay execution of sentence pursuant to section 654 results is an unauthorized sentence, which is subject to correction at any time. (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13; *People v. Hester* (2000) 22 Cal.4th 290, 295.)

Counts 1, 2, and 3 involved the transportation, sale, and possession for sale of methamphetamine during the first transaction. Counts 4, 5, and 6 involved the

32

transportation, sale, and possession for sale of methamphetamine on during the second transaction.  The trial court imposed sentences on counts 2 and 5, pursuant to which defendant stood convicted of sale of methamphetamine.  (Health & Saf. Code, § 11379, subd. (a).)  The trial court imposed but stayed the sentences pursuant to section 654 on counts on counts 1 and 4, transporting methamphetamine, but imposed concurrent sentences on counts 3 and 6, possession of methamphetamine for sale.  The Attorney General concedes, and we agree, that defendant's conduct resulting in his convictions for possession of methamphetamine for sale was incident to the same objective as his conduct resulting in his convictions of sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 2 & 5)—to sell the specific methamphetamine to Costa so Costa could sell the drug to a third party.  Therefore, in remanding the matter, we shall direct the trial court to resentence defendant accordingly, imposing sentences on counts 3 and 6 and then staying execution of those sentences pursuant to section 654.  (See *People v. Duff* (2010) 50 Cal.4th 787, 796; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469.)

### IV.  Drug Program Fee

Health and Safety Code section 11372.7 provides in pertinent part:  "Except as otherwise provided in subdivision (b) or (e), each person who is convicted of a violation of this chapter shall pay a drug program fee in an amount not to exceed one hundred fifty dollars ($150) for each separate offense."  (Health & Saf. Code, § 11372.7, subd. (a).)  However, if a person does not have the ability to pay, the court is not required to impose the fee.  (Health & Saf. Code, § 11372.7, subd. (b).)

In imposing sentence, the trial court did not orally impose a drug program fee.  However, the abstract of judgment indicates that the sentence included a drug program fee in the amount of $820.  "[T]he abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict."  (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070 (*Delgado*).)

33

Thus, the oral pronouncement of judgment, at which the trial court did not impose the drug program fee, controls. (*Ibid.*)

As the Attorney General concedes, on a silent record, it may be presumed that the trial court found that the defendant lacked the ability to pay. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864.) As the Attorney General also concedes, "because the trial court had the discretion to not impose the drug program fee, the prosecutor's failure to object forfeited any claim of error on appeal." (*Ibid.*) We shall direct the trial court to correct the abstract by deleting the drug program fee.

## V. Former Health and Safety Code Section 11370.2 Enhancements

The trial court orally imposed two consecutive three-year terms pursuant to former Health and Safety Code section 11370.2 for defendant's two prior convictions for violation of Health and Safety Code section 11351.5.[7] Former Health and Safety Code section 11370.2, subdivision (c), in effect at the time of the charged offenses, provided, in pertinent part: "Any person convicted of a violation of, or of a conspiracy to violate, Section 11378 or 11379 with respect to any substance containing a controlled substance specified in paragraph (1) or (2) of subdivision (d) of Section 11055 shall receive, in addition to any other punishment authorized by law, including Section 667.5 of the Penal Code, a full, separate, and consecutive three-year term for each prior felony conviction of, or for each prior felony conviction of conspiracy to violate, Section 11351, 11351.5, 11352, 11378, 11378.5, 11379, 11379.5, 11379.6, 11380, 11380.5, or 11383, whether or not the prior conviction resulted in a term of imprisonment."

---

[7] Our review reveals that these sentences do not appear on the abstract of judgment. However, as stated *ante*, it is the trial court's oral pronouncement of judgment that controls, and any conflict between it and the abstract of judgment will be resolved in favor of the trial court's pronouncement of judgment. (*Delgado, supra*, 43 Cal.4th at p. 1070.)

Senate Bill No. 180 (Stats. 2017, ch. 677, § 1 (Senate Bill 180)), effective January 1, 2018, amended Health and Safety Code section 11370.2. Under the amended version of that section, a defendant convicted of a violation of Health and Safety Code section 11378 or 11379 is subject to the three-year enhancement only for prior felony convictions of, or prior felony convictions of conspiracy to violate, Health and Safety Code section 11380. (Health & Saf. Code, § 11370.2, subd. (c).) In other words, under the newly amended version of Health and Safety Code section 11370.2, defendant's two prior felony convictions for violations of Health and Safety Code section 11351.5 would no longer support the imposition of these three-year sentence enhancements.

We granted defendant's request for supplemental briefing on the impact of Senate Bill 180 on his case. In his supplemental brief, defendant asserts that he is entitled to the benefit of the change in the law based on the rule in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). Defendant emphasizes that his case is not yet final, that the change in the law would result in substantially reduced sentence, and, in effect, that nothing in the law indicates that the Legislature intended that the change be applied prospectively only. The Attorney General concedes that the change in law should be applied to defendant's case. We accept the Attorney General's concession.

In *Estrada*, our high court, discussing consideration of legislative intent in the absence of a provision expressly establishing whether a change in the law is to apply prospectively or retroactively, stated: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This

35

intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada, supra*, 63 Cal.2d at p. 745.) This principle applies to statutes governing penalty enhancements as well as statutes governing substantive offenses. (*People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

Recently, Division One of the Fourth District, held that *Estrada* applies to Health and Safety Code section 11370.2 enhancements post Senate Bill 180 for all cases pending appeal when the new law took effect. (*People v. Millan* (2018) 228 Cal.App.5th 647, 651-652.) We agree. However, we also agree with the Attorney General that, on remand, the trial court " ' "is entitled to consider the entire sentencing scheme" ' " and " ' "may reconsider all sentencing choices." ' " (*People v. Nesbitt* (2010) 191 Cal.App.4th 227, 243-244, fn. 18; *People v. Torres* (2008) 163 Cal.App.4th 1420, 1431.) Here, this includes possible reconsideration of its dismissal in the interest of justice of two prior prison term enhancements it previously found true. (§ 667.5, subd. (b).) Defendant appears to agree with this proposition, as he waived filing a reply brief.

## DISPOSITION

The judgment of conviction is affirmed.  The Health and Safety Code section 11370.2 enhancements are struck and the sentences imposed thereon are vacated.  We remand the matter to the trial court for (1) a new trial on defendant's prior strike conviction allegation, and (2) resentencing consistent with this opinion.

            <u>  MURRAY   </u>, J.

We concur:

<u>  ROBIE    </u>, Acting P. J.

<u>  DUARTE   </u>, J.